2017 OK 97

**Robert PARSONS, Appellant,**

**v.**

**The DISTRICT COURT OF PUSHMAT-AHA COUNTY, the Honorable Jana K. Wallace, Associate District Judge, Appellee.**

**115,007**

Supreme Court of Oklahoma.

Filed 12/12/2017

Peter C. Astor, Oklahoma Indigent Defense System, Sapulpa, OK, for Appellant

Jennifer L. Crabb, Assistant Attorney General, Oklahoma City, OK, for Appellee

GURICH, V.C.J.

### I. Facts & Procedural History

¶ 1 On November 21, 2011, Robert Parsons was charged in Pushmataha County District Court, Case No. CF-2011-146, with one count of first degree murder. According to the probable cause affidavit filed by the investigating officer, Parsons confessed to murdering his friend, Garland Cogburn, by striking him in the head with a hatchet. Simulta-

neously with the State's Information, an order was entered by agreement of the parties which required "Robert Parsons be immediately committed to the custody of the Oklahoma Forensic Center (OFC) in Vinita, Oklahoma for outpatient evaluation so that he may be determined competent to stand trial."[1]

¶ 2 After being transferred to OFC, a competency evaluation was conducted by forensic psychologist, Peter Rausch, PhD. On December 12, 2011, Dr. Rausch filed a report finding "[Parsons] was able to remain attentive and respond to questions in a clear and relevant manner. [Parsons] appeared to appreciate the nature of his legal situation and the possible outcomes of his case. [Parsons] demonstrated a general understanding of legal

procedures and he exhibited the capacity to rationally assist counsel."[2] Parsons' counsel stipulated to Dr. Rausch's competency evaluation and criminal proceedings resumed.

¶ 3 On February 29, 2012, Parsons withdrew his not guilty plea and entered a plea of not guilty by reason of insanity (referenced as NGRI). Approximately three months later, the State and Parsons jointly submitted records pertaining to Parsons' mental health history. Included in the materials was an evaluation prepared by Jeannie Russell Ed. D., which detailed her assessment of Parsons' mental state at the time of Cogburn's homicide. On June 6, 2012, the trial court filed a journal entry adjudicating Parsons not guilty by reason of insanity.[3] As required by 22 O.S.2011 § 1161(A)(3) and (B),[4] the trial

1. Order for Treatment, November 21, 2011, Orig. Rec., p. 4.

2. Correspondence to Judge Wallace from Dr. Rausch, Orig. Rec., p. 10.

3. The trial judge's order referenced Dr. Russell's opinion, noting that Parsons was "laboring under a defect of reason from disease of the mind, specifically, Bi–Polar Disorder, Depressed, at the time of the offense and unable to distinguish right from wrong." Journal Entry, Orig. Rec., p. 17.

4. Title 22 O.S.2011 § 1161 provides:
A. 1. An act committed by a person in a state of insanity cannot be punished as a public offense, nor can the person be tried, sentenced to punishment, or punished for a public offense while such person is insane.
2. When in any criminal action by indictment or information, the defense of insanity is raised, but the defendant is not acquitted on the ground that the defendant was insane at the time of the commission of the crime charged, an issue concerning such defense may be raised on appeal. If the appellate court finds relief is required, the appellate court shall not have authority to modify the judgment or sentence, but will only have the authority to order a new trial or order resentencing without recommendations to sentencing.
3. When in any criminal action by indictment or information the defense of insanity is interposed either singly or in conjunction with some other defense, the jury shall state in the verdict, if it is one of acquittal, whether or not the defendant is acquitted on the ground of insanity. When the defendant is acquitted on the ground that the defendant was insane at the time of the commission of the crime charged, the person shall not be discharged from custody until the court has made a deter-

mination that the person is not presently dangerous to the public peace and safety because the person is a person requiring treatment as defined in Section 1-103 of Title 43A of the Oklahoma Statutes.
B. 1. To assist the court in its determination, the court shall immediately issue an order for the person to be examined by the Department of Mental Health and Substance Abuse Services at a facility the Department has designated to examine and treat forensic individuals. Upon the issuance of the order, the sheriff shall deliver the person to the designated facility.
2. Within forty-five (45) days of the court entering such an order, a hearing shall be conducted by the court to ascertain whether the person is presently dangerous to the public peace or safety because the person is a person requiring treatment as defined in Section 1-103 of Title 43A of the Oklahoma Statutes or, if not, is in need of continued supervision as a result of unresolved symptoms of mental illness or a history of treatment noncompliance. During the required period of hospitalization the Department of Mental Health and Substance Abuse Services shall have the person examined by two qualified psychiatrists or one such psychiatrist and one qualified clinical psychologist whose training and experience enable the professional to form expert opinions regarding mental illness, competency, dangerousness and criminal responsibility.
C. 1. Each examiner shall, within thirty-five (35) days of hospitalization, individually prepare and submit to the court, the district attorney and the person's trial counsel a report of the person's psychiatric examination findings and an evaluation concerning whether the person is presently dangerous to the public peace or safety.
2. If the court is dissatisfied with the reports or if a disagreement on the issue of mental illness

and dangerousness exists between the two examiners, the court may designate one or more additional examiners and have them submit their findings and evaluations as specified in paragraph 1 of this subsection.

3. a. Within ten (10) days after the reports are filed, the court must conduct a hearing to determine the person's present condition as to the issue of whether:

(1) the person is presently dangerous to the public peace or safety because the person is a person requiring treatment as defined in Section 1-103 of Title 43A of the Oklahoma Statutes, or

(2) if not believed to be presently dangerous to the public peace or safety, the person is in need of continued supervision as a result of unresolved symptoms of mental illness or a history of treatment noncompliance.

b. The district attorney must establish the foregoing by a preponderance of the evidence. At this hearing the person shall have the assistance of counsel and may present independent evidence.

D. 1. If the court finds that the person is not presently dangerous to the public peace or safety because the person is a person requiring treatment as defined in Section 1-103 of Title 43A of the Oklahoma Statutes and is not in need of continued supervision as a result of unresolved symptoms of mental illness or a history of treatment noncompliance, it shall immediately discharge the person from hospitalization.

2. If the court finds that the person is presently dangerous to the public peace and safety, it shall commit the person to the custody of the Department of Mental Health and Substance Abuse Services. The person shall then be subject to discharge pursuant to the procedure set forth in Title 43A of the Oklahoma Statutes.

a. During the period of hospitalization, the Department of Mental Health and Substance Abuse Services may administer or cause to be administered to the person such psychiatric, medical or other therapeutic treatment as in its judgment should be administered.

b. The person shall be subject to discharge or conditional release pursuant to the procedures set forth in this section.

E. If at any time the court finds the person is not presently dangerous to the public peace or safety because the person is a person requiring treatment pursuant to the provisions of Section 1-103 of Title 43A of the Oklahoma Statutes, but is in need of continued supervision as a result of unresolved symptoms of mental illness or a history of treatment noncompliance, the court may:

1. Discharge the person pursuant to the procedure set forth in Title 43A of the Oklahoma Statutes;

2. Discharge the person, and upon the court's or the district attorney's motion commence civil involuntary commitment proceedings against the person pursuant to the provisions of Title 43A of the Oklahoma Statutes; or

3. Order conditional release, as set forth in subsection F of this section.

F. There is hereby created a Forensic Review Board to be composed of seven (7) members appointed by the Governor with the advice and consent of the Senate. The Board members shall serve for a term of five (5) years except that for members first appointed to the Board: one shall serve for a term ending December 31, 2008, two shall serve for a term ending December 31, 2009, two shall serve a term ending December 31, 2010, and two shall serve for a term ending December 31, 2011.

1. The Board shall be composed of:

a. four licensed mental health professionals with experience in treating mental illness, at least one of whom is licensed as a Doctor of Medicine, a Doctor of Osteopathy, or a licensed clinical psychologist and shall be appointed from a list of seven names submitted to the Governor by the Department of Mental Health and Substance Abuse Services,

b. one member who shall be an attorney licensed to practice in this state and shall be appointed from a list of not less than three names submitted to the Governor by the Board of Governors of the Oklahoma Bar Association,

c. one member who shall be a retired judge licensed to practice in this state and shall be appointed from a list of not less than three names submitted to the Governor by the Judicial Nominating Committee, and

d. one at-large member.

The attorney and retired judge members of the Board shall be prohibited from representing in the courts of this state persons charged with felony offenses while serving on the Board.

2. The Board shall meet as necessary to determine which individuals confined with the Department of Mental Health and Substance Abuse Services are eligible for therapeutic visits, conditional release or discharge and whether the Board wishes to make such a recommendation to the court of the county where the individual was found not guilty by reason of insanity.

a. Forensic Review Board meetings shall not be considered subject to the Oklahoma Open Meeting Act and are not open to the public. Other than the Forensic Review Board members, only the following individuals shall be permitted to attend Board meetings:

(1) the individual the Board is considering for therapeutic visits, conditional release or discharge, his or her treatment advocate, and members of his or her treatment team,

(2) the Commissioner of Mental Health and Substance Abuse Services or designee,

(3) the Advocate General for the Department of Mental Health and Substance Abuse Services or designee,

(4) the General Counsel for the Department of Mental Health and Substance Abuse Services or designee, and

(5) any other persons the Board and Commissioner of Mental Health and Substance Abuse Services wish to be present.

b. The Department of Mental Health and Substance Abuse Services shall provide administrative staff to the Board to take minutes of meetings and prepare necessary documents and correspondence for the Board to comply with its duties as set forth in this section. The Department of Mental Health and Substance Abuse Services shall also transport the individuals being reviewed to and from the Board meeting site.

c. The Board shall promulgate rules concerning the granting and structure of therapeutic visits, conditional releases and discharge.

d. For purposes of this subsection, "therapeutic visit" means a scheduled time period off campus which provides for progressive tests of the consumer's ability to maintain and demonstrate coping skills.

3. The Forensic Review Board shall submit any recommendation for therapeutic visit, conditional release or discharge to the court and district attorney of the county where the person was found not guilty by reason of insanity, the person's trial counsel, the Department of Mental Health and Substance Abuse Services and the person at least fourteen (14) days prior to the scheduled visit.

a. The district attorney may file an objection to a recommendation for a therapeutic visit within ten (10) days of receipt of the notice.

b. If an objection is filed, the therapeutic visit is stayed until a hearing is held. The court shall hold a hearing not less than ten (10) days following an objection to determine whether the therapeutic visit is necessary for treatment, and if necessary, the nature and extent of the visit.

4. During the period of hospitalization the Department of Mental Health and Substance Abuse Services shall submit an annual report on the status of the person to the court, the district attorney and the patient advocate general of the Department of Mental Health and Substance Abuse Services.

G. Upon motion by the district attorney or upon a recommendation for conditional release or discharge by the Forensic Review Board, the court shall conduct a hearing to ascertain if the person is presently dangerous and a person requiring treatment as defined in Section 1-103 of Title 43A of the Oklahoma Statutes. This hearing shall be conducted under the same procedure as the first hearing and must occur not less than ten (10) days following the motion or request by the Forensic Review Board.

1. If the court determines that the person continues to be presently dangerous to the public peace and safety because the person is a person requiring treatment as defined in Section 1-103 of Title 43A of the Oklahoma Statutes, it shall order the return of the person to the hospital for additional treatment.

2. If the court determines that the person is not dangerous subject to certain conditions, the court may conditionally release the person subject to the following:

a. the Forensic Review Board has made a recommendation for conditional release, including a written plan for outpatient treatment and a list of recommendations for the court to place as conditions on the release,

b. in its order of conditional release, the court shall specify conditions of release and shall direct the appropriate agencies or persons to submit annual reports regarding the person's compliance with the conditions of release and progress in treatment,

c. the person must agree, in writing, that during the period the person is granted conditional release and is subject to the provisions thereof, there shall be free transmission of all pertinent information, including clinical information regarding the person, among the Department of Mental Health and Substance Abuse Services, the appropriate community mental health centers and the appropriate district attorneys, law enforcement and court personnel,

d. the court's order placing the person on conditional release shall include notice that the person's conditional release may be revoked upon good cause. The person placed on conditional release shall remain under the supervision of the Department of Mental Health and Substance Abuse Services until the committing court enters a final discharge order. The Department of Mental Health and Substance Abuse Services shall assess the person placed on conditional release annually and shall have the authority to recommend discharge of the person to the Board,

e. any agency or individual involved in providing treatment with regard to the person's conditional release plan may prepare and file an affidavit under oath if the agency or individual believes that the person has failed to comply with the conditions of release or that such person has progressed to the point that inpatient care is appropriate.

(1) Any peace officer who receives such an affidavit shall take the person into protective custody and return the person to the forensic unit of the state hospital.

(2) A hearing shall be conducted within three (3) days, excluding holidays and weekends, after the person is returned to the forensic unit of the state hospital to determine if the person has violated the conditions of release, or if full-time hospitalization is the least restrictive alternative consistent with the person's needs and the need for public safety. Notice of the hearing shall be issued, at least twenty-four (24) hours before the hearing, to the hospital superintendent, the person, trial counsel for the person, and the patient advocate general of the Department of Mental Health and Substance Abuse Services. If the person requires hospitalization because of a violation of the conditions of release or because of progression to the point that inpatient care is appropriate, the court may then modify the conditions of release.

3. If the court determines that the person is not presently dangerous to the public peace or

judge directed additional mental health testing of Parsons, to determine whether he was "presently mentally ill" and "dangerous to public peace or safety."[5] The State did not appeal the decision.

¶ 4 OFC forensic psychologist, Rachele L. Floyd, Psy.D performed the statutory examination of Parsons. To conduct her assessment, Dr. Floyd thoroughly reviewed all relevant court and medical records; conducted several personal interviews with Parsons; interviewed Parsons' wife; consulted Parsons' treating psychiatrist, Dr. Kendall Southern; and independently conducted psychological tests on Parsons. A report detailing her evaluation was presented to the trial court in July 2012. According to the report, Parsons' symptoms were consistent with the diagnostic criteria for bipolar disorder.[6] However, Parsons' hospitalization and treatment following acquittal had abated the symptoms:

> It is unclear how long his Bipolar Disorder has been in remission; however, he has not displayed any signs or reported current symptoms of mental illness since his admission to OFC. Since his admission to this facility, he has not made any threats of harm to himself or others, and appears capable of caring for his basic needs. Therefore, although he has a psychiatric diagnosis, he does not currently meet the criteria of a person who because of 'mental illness' represents an immediate 'risk of

harm to self or others' as defined in Title 43A.[7]

It was Dr. Floyd's belief that Parsons presented "a low risk for future violence in both inpatient and outpatient settings."[8] Nevertheless, Dr. Floyd concluded her report by recognizing Parsons' nonadherence to prescribed medications:

> In reviewing his history, periods of medication non-compliance, including not taking medications at all and not taking them as prescribed, appear to increase his risk for leaving his home unexpectedly and/or making a suicide attempt. Based on this history, Mr. Parsons does appear to be a person who "is in need of continued supervision as a result of ... a history of treatment non-compliance."[9]

Dr. Floyd recommended strict and continual supervision if the trial court were to authorize Parsons' release from OFC.

¶ 5 The trial court scheduled the statutorily required hearing for August 8, 2012, to determine whether Parsons should remain in OFC custody. The only evidence presented at the hearing was Dr. Floyd's report, which was admitted by stipulation of the parties. Ostensibly relying on this report, the trial judge found Parsons "is presently still a danger to the public peace and or safety of others due to treatment non-compliance."[10] The court ordered Parsons to be placed in

---

safety because the person is not a person requiring treatment, it shall order that the person be discharged from the custody of the Department of Mental Health and Substance Abuse Services. (footnotes omitted).

5. Title 22 O.S.2011 § 1161(B)(2) requires an evaluation to determine "whether the person is presently dangerous to the public peace or safety because the person is a person requiring treatment as defined in Section 1-103 of Title 43A of the Oklahoma Statutes or, if not, is in need of continued supervision as a result of unresolved symptoms of mental illness or a history of treatment noncompliance." The trial judge's June 6, 2012, order clearly deviated from the aforementioned statutory language. Journal Entry, Orig. Rec., p. 17.

6. Parsons suffered from mental health problems for years, including being hospitalized five times in the previous twelve years. He experienced manic/hypomanic symptoms while serving in the military, but had not suffered any recent indicia

of mania. Parsons had suffered primarily from depressive episodes, including suicidal ideations and several suicide attempts.

7. Dr. Floyd Evaluation Letter, Orig. Rec., pp. 19–21.

8. Id., p. 21.

9. Id., p. 21.

10. Order, August 8, 2012, Orig. Rec., p. 23. Title 22 O.S.2011 § 1161(C)(3) is actually written in the disjunctive and requires a trial judge to determine whether the subject individual is "presently dangerous to the public peace or safety because the person is a person requiring treatment," or "is in need of continued supervision as a result of ... a history of treatment noncompliance." While Dr. Floyd's report would have supported a finding of historical treatment noncompliance, it did not demonstrate that Parsons was a present danger to the public peace or safety.

the custody of the Oklahoma Department of Mental Health, and returned for commitment at OFC.

¶ 6 On July 30, 2013, Dr. Southern provided the trial court with an annual clinical status update regarding Parsons. According to Dr. Southern, Parsons recognized the importance of complying with his medication regimen. Dr. Southern further noted that Parsons had been given full-grounds privileges within OFC, and had exercised this authorization without any problems. Interestingly, the report also noted that in December 2012, the trial court issued an order approving a supervised therapeutic visit, which permitted Parsons to attend a family funeral.[11] There is nothing in Dr. Southern's letter indicating any problems during the offsite visit. Dr. Southern ended the report by reiterating the Oklahoma Forensic Review Board's (FRB) duty to review Parsons' case under § 1161(F)(3).

¶ 7 Title 22 O.S.2011 § 1161(F) creates the FRB. The board is composed of seven (7) members (four licensed mental health professionals, a licensed Oklahoma attorney, a retired judge, and one at-large member). Members are appointed by the Governor for five-year terms. Under this statutory section, the FRB is vested with authority to recommend therapeutic visits, conditional release, or patient discharge for NGRI acquittees. At the time of Dr. Southern's 2013 annual report, the FRB had made no recommendation with respect to Parsons.

¶ 8 The FRB met on October 22, 2014 and subsequently submitted a report to the district court, which was filed on November 7, 2014. Therein, the FRB recommended Parsons begin weekly supervised therapeutic visits at Grand Lake Mental Health Center (GLMHC). After examining Parsons' progress, the FRB determined that "[therapeutic] visits would play an integral part in his treatment process."[12] It was recommended Parsons attend the day treatment program once per week for approximately two hours. The Pushmataha County District Attorney timely filed a written objection; however, the general objection provided no basis for the State's opposition.

¶ 9 A hearing was held on December 17, 2014. Testimony was offered from Dr. Satwant Tandon, a board certified psychiatrist and the clinical director of OFC. Dr. Tandon testified that therapeutic visits are necessary to provide patients with exposure to a "community setting, and that is the goal that we need to have them experience under different environments."[13] According to Dr. Tandon, Parsons would be supervised by staff from both GLMHC and OFC. Additionally, after returning from therapeutic visits, Parsons would be required to submit to drug/alcohol screening and would be searched for contraband. The State offered no evidence to contradict Dr. Tandon's testimony or the FRB recommendation. Despite no evidence to rebut the FRB's treatment recommendation, the trial judge sustained the State's objection. The trial judge's ruling failed to address the express requirements set forth in 22 O.S.2011 § 1161(F)(3)(b)—specifically, "whether the therapeutic visit is necessary for treatment, and if necessary, the nature and extent of the visit." Instead, the order found Parsons to be "presently dangerous" and a "person requiring treatment."[14] Parsons filed a petition for a writ of mandamus in OCCA case number MA-2015-71, requesting an order compelling the trial court to approve therapeutic visits. OCCA issued an order denying relief on May 27, 2015.

¶ 10 On October 29, 2015, the FRB met once again to discuss Parsons' mental health case. The FRB filed a report with the district court on December 7, 2015, notifying the parties that Parsons would soon begin therapeutic visits at GLMHC. On December 9, 2015, the State objected in the same manner as in 2014. A hearing was held on January 6, 2016, to address the therapeutic visits and the State's objection. Initially, the parties

---

11. A "therapeutic visit" is "a scheduled time period off campus which provides for progressive tests of the consumer's ability to maintain and demonstrate coping skills." 22 O.S.2011 § 1161(F)(2)(d).

12. FRB recommendation letter, Orig. Rec., p. 26.

13. Tr. Hearing December 17, 2014, pp. 15–16.

14. Order, December 29, 2014, Orig. Rec., p. 34.

debated over whether the burden of proof rested with the State or Parsons. The trial judge never issued a ruling on the burden of proof; and consequently, the only testimony was presented on behalf of Parsons. As with the first hearing, the State presented no evidence.

¶ 11 Parsons' wife, Sara Parsons, testified during the January 2016 hearing. Mrs. Parsons indicated that she had been appointed as a patient advocate for purposes of Parsons' treatment team. She also noted that Parsons had previously been approved for therapeutic visits by the trial judge for purposes of attending medical appointments and a family funeral. According to Mrs. Parsons, each of these off-site events took place without incident.

¶ 12 Parsons additionally presented the testimony of Joseph Errico, M.D. In September 2015, Dr. Errico became Parsons' treating psychiatrist. Dr. Errico testified that patients who are housed at OFC following a NGRI judgment go through a graduated program. After patients reach the maximum benefit at a certain therapy level, they are afforded broader privileges within OFC. According to Dr. Errico, such advancements are essential to determine a patient's capacity to function properly in each environmental change. Dr. Errico added that it was essential for Parsons to begin therapeutic visits so his treatment team and FRB members could assess his response and progress. In order to qualify for therapeutic visits, Dr. Errico testified that Parsons must be compliant with OFC behavioral guidelines, including no aggressive behavior within the facility for six months preceding the visits. Dr. Errico also explained the specific importance of Parsons' participation in the GLMHC day program: "we want to know how he conducts himself in [a] less restrictive environment, does he run off, does he get in aggressive behavior over there in a different environment to be able to, you know, relate to other people as he

15. Tr. Hearing Jan. 6, 2016, p. 31.

16. Although there is no case directly addressing § 1161(F), both this Court and the OCCA, have exercised appellate jurisdiction over proceedings relating to persons acquitted under 22 O.S. § 1161. See e.g. State v. Powell, 2010 OK 40, ¶ 9,

would in society."[15] Dr. Errico emphasized that because the treatment team's ultimate goal is integration back into the community, it is necessary to evaluate a patient's reaction to environmental variables.

¶ 13 On February 18, 2016, the trial judge issued an order sustaining the State's objection. Virtually identical to the December 2014 order, the trial court again disregarded the necessity and scope of therapeutic visits as provided for in § 1161(F)(3). On March 16, 2016, Parsons asked the OCCA to assume original jurisdiction and to direct the district court to vacate its order denying therapeutic visits. Parsons also urged the OCCA to clarify procedural requirements for § 1161(F). In an order filed May 18, 2016, the OCCA transferred the matter to this Court for disposition or to determine jurisdiction. In the order, the OCCA expressed its belief that commitments and releases from mental health institutions are traditionally civil matters outside of its criminal jurisdiction. We accepted original cognizance over the matter to first address the appropriate forum for appellate review. Additionally, we previously recast the original proceeding as an appeal from the February 18, 2016, order denying Parsons therapeutic visits. Because we conclude the matter before us is civil in nature, we must address the merits of Parsons' appeal.

### Analysis

#### Appellate Jurisdiction

¶ 14 Initially, we are called on to determine whether the Oklahoma Supreme Court or the Oklahoma Court of Criminal Appeals are vested with jurisdiction to review proceedings pertaining to therapeutic visits recommended for a NGRI acquittee under 22 O.S.2011 § 1161(F). We hold that the trial court's decision to sustain the State's objection to therapeutic visits presents a question of civil law.[16]

237 P.3d 779, 781 (dismissing appeal of a trial court order granting habeas corpus relief to an NGRI acquittee); Harris v. Okla. Cty. Dist. Ct., 1988 OK CR 26, ¶ 4, 750 P.2d 1129, 1131 (finding a trial court acted within its discretion by vacating an order releasing an NGRI acquittee

¶ 15 On May 18, 2016, the Oklahoma Court of Criminal Appeals issued an order deferring jurisdiction in the above-styled cause to the Oklahoma Supreme Court. The OCCA concluded a transfer to this Court was appropriate because (1) Appellant was found not guilty of the underlying criminal complaint by reason of insanity; (2) as a result of the foregoing determination, Parsons has been acquitted of all criminal charges against him; (3) in accordance with 22 O.S. § 1161, Appellant was placed in the custody of the Oklahoma Department of Mental Health and Substance Abuse; (4) Parsons' treatment and/or release from confinement involve issues of mental health outside of the OCCA's jurisdiction; and (5) mental health treatment and release matters are traditionally civil in nature. The OCCA transferred the case to this Court, believing the case no longer involved criminal issues:

> We find nothing in Title 43A conferring jurisdiction upon [the OCCA] to address mental health treatment and commitment simply because the person was committed after being found not guilty by reason of insanity based upon a criminal charge.[17]

 ¶ 16 In every appellate proceeding, we are obligated to scrutinize our jurisdiction to adjudicate the issues presented. Hall v. GEO Group, Inc., 2014 OK 22, ¶ 12, 324 P.3d 399, 404. Article 7, § 4 of the Oklahoma Constitution reads in relevant part:

> The appellate jurisdiction of the Supreme Court shall be coextensive with the State and shall extend to all cases at law and in equity; except that the Court of Criminal Appeals shall have exclusive appellate jurisdiction in criminal cases until otherwise provided by statute and in the event there is any conflict as to jurisdiction, the Supreme Court shall determine which court has jurisdiction and such determination shall be final.

The foregoing provision vests this Court with authority to resolve any jurisdictional uncertainty or conflict. State ex rel. Henry v. Mahler, 1990 OK 3, ¶ 11, 786 P.2d 82, 85. Jurisdictional disputes involve questions of law and are therefore subject to de novo review. Carmichael v. Beller, 1996 OK 48, ¶ 2, 914 P.2d 1051, 1053.

¶ 17 Generally speaking, the demarcation line between civil and criminal subject matter is well-defined and obvious, but that is not always the case. Examples of legal proceedings which have both criminal and civil components include deprived child cases; expungement proceedings; actions seeking issuance of a protective order under 22 O.S. § 60.4; appeals stemming from criminal bond forfeiture; and civil forfeiture suits.[18]

¶ 18 Parsons maintains that post-acquittal proceedings under 22 O.S.2011 § 1161 fall within the purview of mental health, and therefore are civil in nature. Parsons expands on this argument by noting that individuals who commit an act while in a state of insanity cannot be punished under the law. One of the critical distinctions between a criminal matter and a civil one, he posits, is whether the State is attempting to punish an individual for wrongdoing. In the present matter, according to Parsons, the focus is on treatment for mental illness rather than punitive measures. The State claims that despite Parson's acquittal, the remaining case retains its criminal status because the applicable statutory section lies within the Oklahoma Code of Criminal Procedure, and Parsons' commitment is the result of a "criminal judgment." Thus, the State argues any ap-

---

based on the mandatory language for post-acquittal hearing in 22 O.S.1981 § 1161).

17. *Order Transferring Matter to the Oklahoma Supreme Court to Determine Proper Jurisdiction, May 18, 2016, Parsons v. Dist. Ct. of Pushmataha Cty., Case No. PR-2016-187.*

18. 10A O.S.2011 § 1-5-101 (appeal from deprived adjudications or termination of parental rights is commenced by filing with the Oklahoma Supreme Court); 22 O.S.Supp.2016 § 19(C) ("[a]ny [expungement] order entered pursuant to this subsection may be appealed . . . to the Oklahoma Supreme Court."); Marquette v. Marquette, 1984 OK CIV APP 25, ¶ 10, 686 P.2d 990, 993 (holding the Protection From Domestic Abuse Act invokes a civil remedy rather than criminal); Hargrove v. State of Okla. ex rel. Dennis, 1964 OK CR 105, ¶ 4, 396 P.2d 675, 675-76 (appearance bond forfeiture involves civil matter). Even procedural rules have created jurisdictional uncertainty between Oklahoma's two highest courts. See Meyer v. Engle, 2016 OK CR 1, 369 P.3d 37.

peal should be brought before the OCCA. Additionally, the State argues that 22 O.S. 2011 § 1161 is analogous to the competency statutes set forth in 22 O.S.2011 §§ 1175–1175.8. The State further suggests that because the competency statutes also incorporate title 43A, but are still within the jurisdiction of the OCCA, the same must be true for 22 O.S.2011 § 1161.

¶ 19 In the case of <u>Dutton v. City of Midwest City</u>, 2015 OK 51, ¶ 21, 353 P.3d 532, 541, we said that to ascertain the underlying subject-matter of a case, it is necessary to examine "the substantive nature of the Appellant's claims to determine whether the matter is criminal or civil." The essence of a criminal judgment is punishment for wrongdoing and the amount of punishment being imposed. <u>Mahler</u>, ¶ 15, 786 P.2d at 86. Although Parsons could be committed under 22 O.S.2011 § 1161, the State may not continue his confinement as a means to impose punishment. <u>Foucha v. Louisiana</u>, 504 U.S. 71, 80, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992); <u>see also</u> <u>Jones v. United States</u>, 463 U.S. 354, 369, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (recognizing "[an insanity acquittee] may not be punished. His confinement rests on his continuing illness and dangerousness.").

¶ 20 Contrary to the State's assertion, we do not believe that the mere placement of § 1161 within Title 22 renders the provision, ipso facto, a criminal enactment. Title 22 contains multiple provisions which are unquestionably matters of civil law. <u>See</u> e.g., 22 O.S. Supp. 2016 §§ 18 & 19 (expungement of criminal records); 22 O.S. 2011 § 20 (child placement following incarceration of single custodial parent); 22 O.S. 2011 § 36 (civil immunity to citizens aiding peace officers); and 22 O.S. 2011 § 60, et seq. (protective orders).

¶ 21 Finally, the present matter is distinguishable from competency proceedings. Consideration of competence in a criminal case tests an accused's ability "to understand the nature of the charges and proceedings brought against him, and

[whether he] is able to effectively and rationally assist in his defense." <u>Miller v. State</u>, 1988 OK CR 29, ¶ 8, 751 P.2d 733, 736–737. Thus, unlike the issues pertaining to Parsons' therapeutic visits, assessment of a defendant's competence to stand trial is directly related to and an integral part of a pending criminal prosecution.[19]

¶ 22 Parsons is not committed because of a criminal judgment. Although the trial court's final judgment finding Parsons not guilty by reason of insanity was a criminal judgment, his present confinement at OFC stems from an order issued by Judge Wallace subsequent to the NGRI determination and is based on his ongoing mental illness. Once Parsons' acquittal became final, no criminal issues remained and the trial court's order denying the FRB recommended therapeutic visits was a civil matter, subject to this Court's appellate review.

***Did the trial court err (1) by failing to place the burden of proof on the State; and (2) by failing to address the specific mandates of 22 O.S. 2011 § 1161(F)(3)(b)?***

¶ 23 Having determined this Court is vested with appellate jurisdiction, we must now address the merits of this appeal. Parsons raises two primary issues: (1) whether the trial court erred by failing to place the burden of proof on the State in furtherance of its objection to therapeutic visits; and (2) whether the trial court erred in failing to determine whether therapeutic visits are necessary for treatment, and if necessary, the nature and extent of the visit as required by 22 O.S.2011 § 1161(F)(3)(b). We answer both of these questions in the affirmative.

¶ 24 On December 1, 2015, the FRB notified the State that Parsons was scheduled to begin therapeutic visits. The State filed its objection to the proposed treatment on December 9, 2015, triggering a hearing pursuant to § 1161(F)(3)(b). During the hearing on January 6, 2016, Parsons' attorney argued that the evidentiary burden associated with

---

**19.** OCCA has historically assumed jurisdiction over competency issues arising in a criminal prosecution, despite recognizing such proceedings involve civil law issues. <u>Rogers v. Lansdown</u>, 1992 OK CR 25, ¶ 12, 829 P.2d 687, 688; <u>Miller</u>, ¶ 11, 751 P.2d at 738.

contesting the necessity of therapeutic visits should be placed on the State. However, the trial judge neglected to address the subject.

¶ 22 Again, 22 O.S.2011 § 1161(F) creates the FRB, and the board is vested with the power to initiate therapeutic visits for NGRI acquittees.[20] Title 22 O.S.2011 § 1161(F)(3) allows the State to raise an objection to therapeutic visits, but is silent on which party bears the burden of proof in any challenge:

3. The Forensic Review Board shall submit any recommendation for therapeutic visits, conditional release or discharge to the court and district attorney of the county where the person was found not guilty by reason of insanity, the person's trial counsel, the Department of Mental Health and Substance Abuse Services and the person at least fourteen (14) days prior to the schedule visit.

a. The district attorney may file an objection to a recommendation for a therapeutic visit within ten (10) days of receipt of the notice.

b. If an objection is filed, the therapeutic visit is stayed until a hearing is held. The court shall hold a hearing not less than ten (10) days following an objection to determine whether the therapeutic visit is necessary for treatment, and if necessary, the nature and extent of the visit.

¶ 23 This Court exercises plenary, independent, and non-deferential authority in its de novo review of statutory enactments. Welch v. Crow, 2009 OK 20, ¶ 10, 206 P.3d 599, 603. Our primary goal of statutory construction is to determine legislative intent. Patterson v. Beall, 2000 OK 92, ¶ 18, 19 P.3d 839, 845. "Intent is ascertained from the whole act in light of its general purpose and objective considering relevant provisions together to give full force and effect to each."

Tyler v. Shelter Mut. Ins. Co., 2008 OK 9, ¶ 12, 184 P.3d 496, 499-500. This Court will not limit consideration to one word or phrase, but will consider the various provisions of the relevant legislative scheme to ascertain and give effect to the legislative intent and the public policy underlying the intent. Am. Airlines, Inc. v. State ex rel. Okla. Tax Comm'n, 2014 OK 95, ¶ 33, 341 P.3d 56, 65. We will only employ rules of statutory construction when legislative intent cannot be ascertained. Tyler, ¶ 12, 184 P.3d at 500.

¶ 24 Parsons alleges that as the party seeking relief, the State bore the burden of proving therapeutic visits were unnecessary to treatment and/or the nature or scope of the proposed visits was inappropriate. On the other hand, the State characterizes Parsons as the "plaintiff," and contends that the burden of proof falls on squarely on his shoulders because he has superior access to the evidence. We agree with Parsons that as the objecting party, the State has the burden to support its objection by presenting evidence in opposition to the visits.

¶ 25 First, the plain language of the statute requires commencement of therapeutic visits unless a timely objection is filed by the State. The statute contains a clear distinction between therapeutic visits and a conditional release or discharge. In the case of therapeutic visits, a hearing occurs only if the district attorney voices opposition by filing an objection (§ 1161(F)(3)(b)).[21] Moreover, by filing an objection the State was the party pursuing a judicial remedy. This Court has repeatedly imposed the burden of proof on "the party who asserts an entitlement to the judicial relief sought." In re Initiative Petition No. 397, 2014 OK 23, ¶ 39, 326 P.3d 496, 512; Tucker v. Cochran Firm–Criminal Def. Birmingham L.L.C., 2014 OK 112, ¶ 21, 341 P.3d 673, 682. Here, the State's burden would require sufficient evidence tending to show it

---

20. OAC § 277:1-1-1 provides that NGRI acquittees "shall receive an annual review of his or her case and clinical status by the Forensic Review Board." The regulations further limit FRB findings in cases involving therapeutic visits to: (1) whether therapeutic visits will be recommended to the court; (2) if a therapeutic visit is recommended, the location of the visit; (3) [t]he date and time the visit will begin and the duration of the visit; (4) the entity or person to provide supervision of the consumer during the visit; (5) any other parameters to be recommended to the court reviewing the recommendation for a therapeutic visit. OAC § 277:1-1-3(b)(1)-(5).

21. Whereas, in the case of a NGRI acquittee's conditional release or discharge, a hearing is mandatory, even if the State does not protest release or discharge (§ 1161(G)).

is more likely than not: (1) therapeutic visits are unnecessary for Parsons' treatment; and/or (2) if therapeutic visits are necessary, whether the nature and extent of the proposed therapeutic visits is excessive or inappropriate.

¶ 26 We find the language in the statute demonstrates a legislative intent to afford broad authority to the FRB when recommending therapeutic visits for NGRI acquittees. Such visits take place automatically, without a need for prior court approval, unless the State raises a timely objection. In our view, placing the burden of proof on the State, as the objecting party, is consistent with legislative intent and the purpose served by the FRB. We find the State must support any objection to therapeutic visits by a preponderance of the evidence.[22] See McKellips v. St. Francis Hosp., Inc., 1987 OK 69, ¶ 10, 741 P.2d 467, 471.

### Conclusion

¶ 27 We hold that the trial court's decision to sustain the State's objection to therapeutic visits presents a question of civil law, and under the statute, the State had the burden to support any objection with sufficient evidence. As discussed previously, the State presented no evidence challenging the necessity of therapeutic visits. On the other hand, the uncontroverted evidence presented on behalf of Parsons established that therapeutic visits were a necessary part of Parsons' treatment. Based on the clear record, it was error for the trial court to sustain the State's objection to therapeutic visits. However, given the passage of time, we remand this case for a new hearing consistent with the parameters outlined by this opinion.[23]

¶ 28 ALL JUSTICES CONCUR

---

22. Although the statute is silent on the applicable burden, we note that when seeking commitment following a NGRI acquittal, 22 O.S.2011 § 1161(C)(3)(b) requires the state to prove the statutory prerequisites by a preponderance of the evidence.

---

23. The Court notes that 22 O.S. § 1161 has been amended, but such amendments do not affect outcome of this decision. Williams Companies, Inc. v. Dunkelgod, 2012 OK 96, ¶ 18, 295 P.3d 1107, 1113.